Robert Allen GATTIS, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 37, 1996.

Supreme Court of Delaware.

Submitted: May 13, 1997.

Decided: July 10, 1997.

As Revised on Denial of Rehearing Sept. 8, 1997.

**1176**

Kevin J. O'Connell (argued), and Anthony A. Figliola, Jr., Wilmington, for Appellant.

Timothy J. Donovan, Jr. (argued), William E. Molchen, Thomas E. Brown, and Marsha J. Epstein, Deputy Attorneys General, Department of Justice, Wilmington, for Appellee.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT and BERGER, JJ., constituting the Court en banc.

VEASEY, Chief Justice.

This is an appeal from the Superior Court's denial of Robert Allen Gattis' motions for postconviction relief. Gattis was convicted of Murder First Degree, Burglary First Degree, Possession of a Deadly Weapon by a Person Prohibited and two counts of Possession of a Deadly Weapon during Commission of a Felony. These offenses all related to the May 9, 1990 shooting death of Shirley Y. Slay. During the penalty phase of his trial, the jury, by a count of ten to two, found that the aggravating circumstances outweighed the mitigating circumstances. Such a finding is tantamount to a recommendation of a sentence of death. After hearing additional argument from counsel, the Superior Court concurred with the jury's recommendation and sentenced Gattis to death by lethal injection.

On direct appeal, this Court affirmed the Superior Court's decision.[1] Gattis then filed a petition for a writ of certiorari in the United States Supreme Court. That Court denied his petition.[2] On November 21, 1994, and February 8, 1995, Gattis filed motions for postconviction relief in the Superior Court. The Superior Court denied the motions.[3] This appeal followed.

Gattis alleges, inter alia, that his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated, primarily due to his having received ineffective assistance of counsel. After Gattis filed this appeal, this Court remanded the case to the Superior Court for further inquiry into two questions raised by the appeal: (a) whether the State's theory of the homicide at trial was impossible and (b) whether the State improperly excluded a potential juror for gender related reasons.[4] After considering all of the arguments presented by Gattis in support of his appeal and after reviewing the Superior Court's decisions upon remand, we are satisfied that these questions are to be answered in the negative and that Gattis' remaining arguments are not persuasive. Accordingly, we affirm the Superior Court's decision to deny Gattis' motions for postconviction relief.

### The Facts

A full exposition of the facts of this case is recorded in this Court's opinion upon Gattis' direct appeal.[5] Therefore, we include in this opinion only those facts that are pertinent to our resolution of the issues presented in this appeal.

On the evening of May 9, 1990, Robert Allen Gattis entered Shirley Y. Slay's apartment, beat her about the head and then stalked out of the apartment. After retrieving a loaded handgun and obtaining a different car from a friend, Gattis returned to Ms.

1. *Gattis v. State*, Del.Supr., 637 A.2d 808, 823 (1994).

2. *Gattis v. Delaware*, 513 U.S. 843, 115 S.Ct. 132, 130 L.Ed.2d 75 (1994).

3. *State v. Gattis*, Del.Supr., Cr. A. Nos. IN90–05–1017 to 1019–R2; IN90–05–1106 and 1107–R2; I.D. No. 90004576DI, slip op. at 3, 1995 WL 790961 (Dec. 28, 1995) [hereinafter *Postconviction op.*].

4. *Gattis v. State*, Del.Supr., No. 37, 1996, Holland, J. (Oct. 15, 1996) (ORDER).

5. *Gattis v. State*, 637 A.2d at 810–11.

Slay's apartment, even after being told by police to stay away. Gattis forcefully opened the door to Ms. Slay's apartment. He fired one round which struck her directly between the eyes. She fell where she stood and died shortly thereafter. The autopsy revealed that Ms. Slay was shot by a .38 caliber handgun from a distance of 4 to 18 inches. Gattis testified at trial and maintains on appeal that the shooting was an accident and that the gun discharged while he struggled to enter Ms. Slay's apartment.

There was some dispute at trial over the width of the door opening when Ms. Slay was shot. At trial, Gattis testified that the door was open between 24 and 30 inches. The first witness to arrive at the scene after the shooting testified that the door would open between 8 and 12 inches before hitting Ms. Slay's feet. The second witness to arrive at the scene testified that the door was open about two feet, that he had to push the door slightly to get inside and that Ms. Slay's body was lying right at the door. One of the investigating officers who arrived at the scene testified that the door would open about three-quarters before hitting Ms. Slay's feet.[6]

Gattis was charged with first degree murder, first degree burglary, possession of a deadly weapon by a person prohibited and possession of a deadly weapon during commission of a felony (2 counts). Trial commenced on September 9, 1992. On September 22, 1992, the jury convicted Gattis on all counts in the indictment. Then, by a vote of ten to two, the jury found, by a preponderance of the evidence, that the aggravating circumstances found to exist outweighed the mitigating circumstances.

The Superior Court then made its independent determination that the aggravating circumstances outweighed the mitigating circumstances, and on October 29, 1992 the Superior Court ordered that Gattis be executed by lethal injection.

### Subsequent Procedural History

On Gattis' automatic direct appeal, this Court, sitting *en Banc,* affirmed both the convictions and the sentence.[7]

Counsel for Gattis filed a petition for writ of certiorari to the United States Supreme Court. Certiorari was denied October 3, 1994.

On October 21, 1994, the Superior Court set a new execution date of December 2, 1994. On November 21, 1994, Gattis filed a *pro se* motion for postconviction relief pursuant to Superior Court Criminal Rule 61. On that same date, the Superior Court entered an order staying the scheduled execution and setting a schedule for the filing of an amended motion for postconviction relief.

On February 8, 1995, Gattis filed an amended motion for postconviction relief. By initial decision dated August 24, 1995, the Superior Court denied Gattis' motions for postconviction relief. Gattis filed a timely motion to reargue, and the Superior Court conducted a Rule 61 hearing on October 20, 1995. By memorandum opinion dated December 28, 1995, the Superior Court decided that none of the facts adduced at the Rule 61 hearing had altered the conclusions reached in its initial decision of August 24, 1995, and denied Gattis' motions for postconviction relief.[8] The Superior Court rescheduled Gat-

6. *State v. Gattis,* Del.Super., I.D. No. 90004576DI, slip op. at 7–8, 1997 WL 127007 (Feb. 13, 1997) [hereinafter *Slip op. II* ].

7. *Gattis v. State,* Del.Supr., 637 A.2d 808, 823 (1994). On direct appeal, this Court remanded the case to the Superior Court for the purpose of conducting an evidentiary hearing relating to Gattis' claim of newly discovered evidence. *Gattis v. State,* Del.Supr., Nos. 498 and 514, 1992, Walsh, J. (Mar. 16, 1993) (ORDER). Specifically, Gattis contended that Ms. Slay's daughter, Tykisha Slay, had accused her grandfather of sexually molesting her, and that that molestation could account, in part, for the emotional distress Tykisha displayed at the trial. The Superior Court concluded from all the evidence presented that any display of emotionalism by Tykisha Slay at the time of trial was attributable to the death of her mother. The Superior Court also concluded that its findings after the penalty hearing did not warrant amending, nor did it find that any other relief was appropriate. We agreed, and subsequently affirmed.

8. *Postconviction op., supra* note 3, at 3.

tis' execution for March 29, 1996.[9]

Gattis appealed to this Court the denial of his motions for postconviction relief. In his appeal, he argued, inter alia, that, if given the opportunity, he could show that the State's theory of the case was impossible. He also argued that the State unconstitutionally struck a potential juror on the basis of his gender. This Court remanded the case to the Superior Court for further proceedings on these two matters.

On remand, the Superior Court again denied Gattis' motions.[10] This is Gattis' appeal of the Superior Court's decisions both before and after remand.

### Standard of Review

■ This Court reviews for abuse of discretion the Superior Court's decision on a motion for postconviction relief,[11] including a motion for postconviction relief based upon claims of ineffective assistance of counsel.[12] We review questions of law *de novo*.[13] Several of Gattis' claims were not raised below or on direct appeal because, he alleges, the assistance of counsel was ineffective. Under Superior Court Criminal Rule 61(i)(3), such issues are procedurally barred from appellate review unless the defendant successfully demonstrates that counsel was ineffective and that counsel's ineffectiveness prejudiced his rights. We find Gattis has not overcome the procedural bar.

### Right to a Fair Trial

Gattis contends that his right to due process and a fair trial were violated when the State waited until the penalty phase to apprise the defense of a statement Ms. Slay made in a 1987 police report stating that the discharge of Gattis' gun during an earlier incident at an American Legion Hall was accidental. Gattis argues that earlier disclosure of this statement would have diluted the State's argument that the discharge of Gattis' gun on the day of Ms. Slay's death could not have been accidental. This issue was neither raised at trial nor on direct appeal. Gattis alleges that the issue was never raised because he received ineffective assistance from counsel.

■ To establish a claim of ineffective assistance of counsel, Gattis is required to show that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) the deficiencies in counsel's representation caused Gattis actual prejudice.[14] To show that counsel's representation fell below an objective standard of reasonableness, Gattis bears a heavy burden. He must overcome the strong presumption that his counsel's representation was professionally reasonable.[15] Moreover, this Court will strive to eliminate "the distorting effects of hindsight," and evaluate the trial from counsel's perspective at the time.[16]

■ To show actual prejudice, Gattis must show that there existed a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different.[17] Mere allegations of ineffectiveness will not suffice. Rather, a

9. *State v. Gattis*, Del.Super., C.A. No. IN90–05–1017, 1995 WL 790961 (Dec. 28, 1995) (Death Sentence).

10. *Slip op. II, supra* note 6, at 18 (denial of motion for postconviction relief); *State v. Gattis*, Del.Super., ID No. 90004576DI, slip op. at 17, 1996 WL 769328 (Dec. 11, 1996) (denial of motion for new trial) [hereinafter *Slip op. I* ].

11. *Dawson v. State*, Del.Super., 673 A.2d 1186, 1190, *cert. denied*, —— U.S. ——, 117 S.Ct. 127, 136 L.Ed.2d 76 (1996); *Bailey v. State*, Del. Supr., 588 A.2d 1121, 1124 (1991).

12. *Dawson*, 673 A.2d at 1196; *Shockley v. State*, Del.Supr., 565 A.2d 1373, 1377 (1989).

13. *Dawson*, 673 A.2d at 1190; *Bailey*, 588 A.2d at 1124.

14. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 2064–65, 2068, 80 L.Ed.2d 674 (1984); *Dawson*, 673 A.2d at 1190, 1196; *Albury v. State*, Del.Supr., 551 A.2d 53, 58 (1988).

15. *Wright v. State*, Del.Supr., 671 A.2d 1353, 1356, *cert. denied*, —— U.S. ——, 116 S.Ct. 2509, 135 L.Ed.2d 198 (1996) (quoting *Flamer v. State*, Del.Supr., 585 A.2d 736, 753 (1990)).

16. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

17. *Wright v. State*, 671 A.2d at 1356; *Skinner v. State*, Del.Supr., 607 A.2d 1170, 1172 (1992).

defendant must make, and substantiate, specific allegations of actual prejudice.[18]

■ In *Brady v. Maryland,* the United States Supreme Court established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[19] Here, Gattis argues that the State violated this precept when it withheld, until the penalty phase of his trial, the 1987 police report with Ms. Slay's statement about his allegedly accidental discharge of a gun. He argues that such a delay was both objectively unreasonable and caused him actual prejudice—that there existed a reasonable probability that earlier disclosure of the police report would have changed the outcome of the trial.[20] We disagree.

The Superior Court categorically rejected Gattis' contention that there was a reasonable probability that the outcome of Gattis' trial would have been different given earlier disclosure of the police report.[21] First, the 1987 incident was wholly unrelated to the Slay shooting on the night of May 9, 1990. Second, Ms. Slay's statement in the 1987 report directly contradicted other statements she made about that same incident. Third, Gattis' deliberate acts of retrieving a handgun, borrowing a friend's car, disobeying the police order to stay away from the Slay apartment, forcefully opening Ms. Slay's door and shooting Ms. Slay squarely between the eyes, mitigate heavily against any evidence contained in the 1987 police report that the May 9 shooting may have been an accident.

Finally, before trial, the defense was aware of and relied upon to construct its accident defense, a note written by Ms. Slay shortly before her death indicating that Gattis did not mean to hurt her and that it was an accident.

In light of the exculpatory evidence already in the hands of the defense and the overwhelming evidence mitigating against a finding that Ms. Slay's death was accidental, the Superior Court did not abuse its discretion in denying Gattis' motion for postconviction relief due to the State's delay in providing the defense with the 1987 police report. The Superior Court's ruling was neither arbitrary nor capricious, but was based soundly on the evidence presented to it. Accordingly, we conclude that Gattis' *Brady* argument fails the *Strickland* test. Although the report might have been marginally helpful to the defense if it had been provided earlier, the State's delay did not fall below an objective standard of reasonableness. Moreover, we are not persuaded that earlier provision of the report would have resulted in a different outcome at trial.

### *Right to a Speedy Trial*

Gattis next alleges that, due to ineffectiveness of trial counsel, he was denied the right to a speedy trial in violation of the Sixth Amendment as applicable to the states through the Fourteenth Amendment to the United States Constitution.[22]

■ In *Barker v. Wingo,* the United States Supreme Court set forth a four-part analysis for determining whether a defendant

---

18. *Wright,* 671 A.2d at 1356; *Younger v. State,* Del.Supr., 580 A.2d 552, 556 (1990); Super.Ct.Cr.R. 61(b)(2). Rule 61(b)(2) provides:
 (2) Content of Motion [for Postconviction Relief]. *The motion shall specify all the grounds for relief which are available to the movant and of which the movant has or, by the exercise of reasonable diligence, should have knowledge, and shall set forth in summary form the facts supporting each of the grounds thus specified.*

19. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963).

20. *U.S. v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985) (stating that material evidence is evidence that, if dis-

closed to the defense, would have resulted in a different outcome at trial, and that 'reasonable probability' is a probability sufficient to undermine confidence in the outcome of the trial).

21. *Postconviction op., supra* note 3, at 12.

22. Although Gattis bases his claim solely upon federal constitutional grounds, the Delaware Constitution also guarantees to defendants the right to a speedy trial. DEL CONST. art. I, § 7; *Fensterer v. State,* Del.Supr., 493 A.2d 959, 964 (1985), *rev'd on other grounds,* 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985).

# 1180

has been denied his right to a speedy trial. To make this determination, a court must consider: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant.[23]

Because it is impossible to discern with precision when the right to a speedy trial has been denied a defendant, each instance where such denial is claimed must be evaluated in the context of the particular facts of that case.[24] Here, Gattis was arrested on May 10, 1990, and his trial began September 9, 1992. The primary reason for the 28–month delay was that Gattis' counsel requested continuances on three occasions for the purpose of obtaining neurological testing. These continuances spanned the period from November 1990 through November 1991. The reason for the final delay was that Gattis participated in the certification procedures relating to the revised Delaware death penalty statute.

 Undertaking the four-prong analysis prescribed in *Barker*, a 28–month delay between arrest and trial is indeed substantial. Yet the lion's share of the delay period was caused not by the State but by Gattis' counsel. For purposes of a speedy trial analysis, delays not attributable to the State should be subtracted from the time period in question.[25] Gattis contends that the delays were due to counsel's ineffectiveness. The bulk of the delay period was attributed to counsel's requests for continuances to obtain medical evaluations. Without more, we see nothing ineffective about counsel's requested continuances.

Participation in the certification process relating to the constitutionality of Delaware's new death penalty statute caused the final delay. Gattis voluntarily participated. As such, his claim that he was denied a speedy trial because of his participation is one of "self-denial," in that he voluntarily declined to assert his speedy trial right in the hopes that the certification process would result in an outcome favorable to his case.

The last prong under *Barker* was whether, regardless of the reasons for the delays, those delays resulted in prejudice against Gattis. Gattis however, puts forth no evidence of any prejudice, except to say that the "28–month period of delay is presumptively prejudicial," and that the "lack of diligence on the part of Gattis' public defenders ... may cost him his life." No substantiation is given for these assertions, and we find such assertions devoid of merit. Because Gattis fails to make and substantiate specific allegations of actual prejudice, and because we find no evidence of prejudice to Gattis resulting from the delay, we conclude that the Superior Court did not abuse its discretion in denying Gattis' motion for postconviction relief.

### *Death–Qualified Jury*

Gattis argues that because several potential jurors were stricken for cause by the Superior Court when they expressed doubts concerning their ability to vote for the death penalty, the resulting "death-qualified" jury was more prone to convict him. The resulting composition of his jury, Gattis contends, violates both the fair cross-section[26] and im-

**23.** *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2191–92, 33 L.Ed.2d 101 (1972).

**24.** *Id.* at 521–22, 92 S.Ct. at 2187 ("any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case.").

**25.** *See Barker v. Wingo,* 407 U.S. at 536, 92 S.Ct. at 2195 ("we would be reluctant indeed to rule that a defendant was denied [the right to a speedy trial] on a record that strongly indicates ... that the defendant did not want a speedy trial."); *see also id.* at 529, 92 S.Ct. at 2191 ("if the delay is attributable to the defendant then his waiver of [the right to a speedy trial] may be given effect.").

**26.** Without developing an argument, Gattis makes the conclusory statement in this appeal that a death qualified jury violates his right to a jury selected from a fair cross-section of the community. Such a contention was rejected by the United States Supreme Court in *Lockhart v. McCree,* 476 U.S. 162, 175, 106 S.Ct. 1758, 1765–66, 90 L.Ed.2d 137 (1986): the fair cross-section principle is "never invoked ... to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large." *Lockhart,* 476 U.S. at 173, 106 S.Ct. at 1764. Because we find *Lockhart* dispositive on this issue, we devote the rest of jury-selection sections of this opinion to Gattis' remaining arguments.

partiality requirements of the Sixth and Fourteenth Amendments and denied him a fair trial. Gattis asserts that this issue was raised neither at trial nor on direct appeal because his counsel was ineffective.

In *Blount v. State,* this Court stated that "the Constitution does not prohibit the States from 'death qualifying' juries in capital cases."[27] In fact, justice is not served by allowing persons to sit on a jury in a capital case who are unable to render an impartial verdict because of their opposition to the death penalty.[28] In *State v. Cohen,* this Court stated,

> Although not the final arbiters of punishment, jurors still play a vital and important role in the sentencing procedure. The jury sits as the conscience of the community in deciding whether to recommend life imprisonment or the death penalty. Any personal views which would prevent its members from impartially performing this solemn responsibility in accordance with the trial court's instructions are impermissible and contrary to law.[29]

▪ Gattis contends in this appeal that Peggy Lewis, Marya Dull and Sara Christian were improperly stricken for cause because they did not make it unmistakably clear that they could never, under any circumstances, impose a sentence of death. Gattis misapprehends the controlling standard for determining jury qualification on this issue. The standard is not whether, under any conceivable set of circumstances, the juror could never recommend the death sentence. Rather, the standard is whether the juror's views render the juror unable to comply with the trial court's instructions and her oath.[30]

▪ After reviewing the testimony of Ms. Lewis, Ms. Dull and Ms. Christian, we are satisfied that none of the three was improperly excused. The following colloquy took place between Ms. Lewis and counsel during jury selection:

Q: In spite of your opinions regarding the death penalty, could you nevertheless recommend the death penalty, if the evidence so warrants, knowing that such a determination could influence the Court in deciding what sentence to impose upon the defendant?

A: That's a question I've been thinking real hard about since I've been here. To be honest, I don't think I could....

Q: Now if the facts and circumstances so warrant and the law so allows, could you recommend a sentence of death?

A: I'm honestly not sure. I probably, right now, would still say no ... I honestly don't know at this point.

. . .

Q: And would you characterize that belief as being a bottom line kind of case, simple opposition to the death penalty?

A: Uh-huh. Well, no, because I—I'm not sure that I can say I'm actually opposed to it, but for me to be the one to make that type of a decision, I couldn't do it. I don't feel that I could do it.

Q: You, you could not do it—

A: Right.

Q: —under any circumstances?

A: I don't think so

With Ms. Dull, the questioning went as follows:

Q: Do you have any religious, conscientious or other opposition to the death penalty?

A: I have a lot of reservations about the death penalty. I don't feel at all comfortable with it. I've always counted

27. *Blount v. State,* Del.Supr., 511 A.2d 1030, 1037 (1986) (quoting *Lockhart v. McCree,* 476 U.S. at 175, 106 S.Ct. at 1765–66).

28. *Hooks v. State,* Del.Supr., 416 A.2d 189, 194 (1980) ("only those jurors who would be unable to render an impartial verdict because of their opposition to capital punishment could be excused for cause."); *accord Hobbs v. State,* Del. Supr., 538 A.2d 723, 726 (1988) ("the controlling standard for determining a prospective juror's qualification based on his or her view on capital punishment is the juror's ability to comply with the trial court's instructions and his/her oath.").

29. *State v. Cohen,* Del.Supr., 604 A.2d 846, 856 (1992) (citations omitted).

30. *Hobbs v. State,* 538 A.2d at 726.

myself fortunate not to be in a position of having to make that kind of decision.

Q: Well, now ... is the time when it becomes necessary perhaps to do so. Would you be able to recommend a sentence of death [if] the evidence so warranted?

A: I doubt it. That would not affect my judgment on whether or not a crime had been committed, but it might very well affect my vote on whether or not the death penalty should be imposed.

Q: Now, this feeling that you have ... is it based upon religious beliefs or moral beliefs or just your own cons[cience] or something else?

A: Well, it's based on my cons[cience].... At this point in time in my life, the death penalty seems like an act of barbarism in which we kind of descend to the criminal's level....

Q: And understanding that view, let me ask you again, if there is a penalty hearing in this case and if the evidence and the circumstances so warrant, would you be able to recommend a sentence of death?

A: It's very difficult for me to say that absolutely, but I feel that I would not be able to. That's the way I feel right now. I could ... change my mind. I just can't say.... The views that I hold now are that I find the death penalty totally repugnant.

Finally, the following discussion took place between counsel and Ms. Christian:

Q: Was your answer yes to any of the questions that were asked you in the large courtroom the other day?

A: Yes.

Q: Which one?

A: I don't believe in capital punishment.... Except under extreme circumstances.

Q: Well, what do you mean by that?

A: Like, for instance, mass murders.... Kidnaping and generally that kind of thing.

Q: Okay. Let me ask you if the facts and circumstances so warrant and such a sentencing recommendation would be permissible under the law in this case, would you not be able to recommend a sentence of death?

A: I don't think I could be responsible for taking another person's life.

Q: Is that to say ... in this case you could not vote for a sentence of death?

A: I don't really know anything about this case, but I don't believe I could.

Q: Okay. Well, let me suggest this case does not encompass a mass—

A: Right.

Q: —a serial killer.

A: Right, I understand that, yes.

Q: Nor is there any allegation of kidnaping.

A: Or sadism.

Q: Sadism. Okay.

A: All right. Then my answer would be I could not.

Each of the above three juror candidates expressed unambiguously that she would not be able to recommend a sentence of death in this case even if the facts and the law so allowed. In our view, their statements show that each would be unable to put aside personal feelings against the death penalty regardless of the evidence or in deference to the rule of law.[31] Because we find that Ms. Lewis, Ms. Dull and Ms. Christian were not improperly struck, we find meritless Gattis' contention that his counsel's assistance was ineffective for not objecting to the exclusion of these three potential jurors.

31. See Lockhart v. McCree, 476 U.S. at 176, 106 S.Ct. at 1766 ("those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law."); Ross v. State, Del.Supr., 482 A.2d 727, 734 n. 8 (1984) (noting the distinction between the improper exclusion of a prospective juror who harbors doubts about capital punishment and the proper exclusion of a person who would not recommend the penalty of death regardless of the evidence).

### Gender–Based Use of Peremptory Challenge

In addition, Gattis argues that the State used a peremptory challenge to strike Mr. Wilfred Moore because of his gender, contrary to the United States Supreme Court's holding in *J.E.B. v. Alabama ex rel. T.B.*[32] This Court remanded the case to the Superior Court for further proceedings on this issue. On remand, the Superior Court reviewed the parties' submissions and concluded that the State "did not violate either the spirit or the letter of the law during the selection of Gattis' jury."[33]

 During jury selection, Mr. Moore was questioned as follows:

Q: Now, if the facts and circumstances so warrant, could you find a verdict of guilty?

A: Yes, sir, I could.

. . .

Q: If the facts and circumstances so warrant, could you recommend a sentence of death?

A: I don't know, sir.

Q: Well, let's go back to that. If the facts and circumstances so warrant, could you recommend a sentence of life imprisonment?

A: Yes, sir, I could.

Q: All right. Now, you did indicate that you would follow the Court's instructions on the law whether you agreed with that law or not.

A: Right.

Q: Taking those instructions in mind, then, and taking into account all the facts and circumstances, now, if the facts and circumstances so warrant and if the Court's instructions so permit, could you recommend a sentence of death?

A: It's like going to war. I don't know if I—you know, until the time comes, truly in my heart would know if I could bring a bullet up there. I don't know until the time comes.

Q: Okay. Philosophically, generally, you're not opposed to the death penalty?

A: I believe in the death penalty, but I don't know if I could be the one to say, yes, sentence this defendant to death until the time comes.

The State then asked the court that Mr. Moore be struck for cause, stating,

Your Honor, I would like to make a record for the reason for striking that juror if the Court believes it may be appropriate. . . . Number one, I believe that this juror is very, very conservative in his application of the . . . death penalty. He answered very quickly 'yes' to the possibility of imposing a life sentence under the appropriate facts and circumstances, yet, to our belief, had a very difficult time in answering whether or not he could impose the death penalty under the appropriate circumstances. He seemed to be very, very conservative in the application of the death penalty.

Number two, he is an older gentleman and we have, I believe, four or five older gentlemen on the jury panel already. And I would suggest that it's the State's point of view that we would prefer to have some more women on the jury.

The Superior Court did not excuse Mr. Moore for cause, finding that his ambivalence about the death penalty was not strong enough to prevent him from following the court's instructions or his oath as a juror. The State then used a peremptory challenge to exclude him. The Superior Court allowed the strike, upholding the State's use of a peremptory challenge after remand by this Court, concluding that the primary motivation behind the State's action was not Mr. Moore's gender.[34]

The United States Supreme Court addressed the constitutionality of gender-based peremptory challenges in *J.E.B. v. Alabama*, holding that litigants may not use peremptory challenges to strike potential jurors solely

---

**32.** *J.E.B. v. Alabama ex. rel T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

**33.** *Slip op. I, supra* note 10, at 3.

**34.** *Slip op. I, supra* note 10, at 17.

on the basis of the person's gender.[35] But a juror may be stricken if the explanation proffered by the striking party is based upon "a juror characteristic other than gender, and the proffered explanation [is not] pretextual." [36] Additionally, in *United States v. Darden*, the Eighth Circuit stated,

If a party exercises a peremptory challenge in part for a discriminatory purpose, a trial court must decide "whether the party whose conduct is being challenged has demonstrated by a preponderance of the evidence that the strike would have nevertheless been exercised even if an improper factor had not motivated in part the decision to strike." If so, the peremptory challenge is not subject to constitutional attack.[37]

The Superior Court concluded that, although the State considered the gender of Mr. Moore, gender was not the State's primary motivation for striking him. The court noted that, before the State struck Mr. Moore, four men and three women had been selected for the jury, and the State had used four challenges to exclude two men and two women. The final jury was composed of six men and six women.[38] Based upon the State's conduct throughout the entire jury selection process, the Superior Court was satisfied that the State neither harbored nor displayed any intent to discriminate against men, and that in the particular instance of Mr. Moore, the State carried its burden of showing that it would have challenged him even in the absence of any gender-related

reason.[39] We find no abuse of discretion in the Superior Court's determination.[40]

### Inadequate Preparation for Trial

Gattis argues that his counsel unreasonably and prejudicially failed properly and adequately to prepare for trial. Specifically, Gattis contends that his attorneys (a) failed to determine and develop adequately his version of the facts; (b) failed to interview the relevant witnesses; (c) failed to use the available means of discovering exculpatory physical and testimonial evidence; (d) failed to make appropriate objections during the course of trial; and (e) did not have any unified theory of defense to the charges brought against him.

■ In *Riley v. State*, this Court stated, "Effective representation by counsel depends upon 'adequate investigation and pre-trial preparation.' " [41] For Gattis to prevail, he must show that counsel's actions fell short of an objectively reasonable standard and that there is a reasonable probability that, had it not been for counsel's deficient conduct, the results at trial would have been different. A 'reasonable probability' is defined as a probability sufficient to undermine confidence in the outcome of the trial.[42] Gattis must also overcome the strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance.[43] For the reasons that follow, we conclude that Gattis' counsel's trial preparation did not fall below standard and did not cause Gattis to suffer actual prejudice.

35. *J.E.B. v. Alabama*, 511 U.S. at 143, 114 S.Ct. at 1429.

36. *Id.* at 145, 114 S.Ct. at 1429–30.

37. *U.S. v. Darden*, 8th Cir., 70 F.3d 1507, 1531 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1449, 134 L.Ed.2d 569 (1996) (quoting *Jones v. Plaster*, 4th Cir., 57 F.3d 417, 421 (1995)).

38. *Slip op. I, supra* note 10, at 14.

39. *Id.* at 16.

40. *See Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct. 1859, 1869, 114 L.Ed.2d 395 (1991) ("As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on de-

meanor and credibility lies 'peculiarly within a trial judge's province.' ") (quoting *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985)); *Baynard v. State*, Del.Supr., 518 A.2d 682, 688 (1986) ("Sorting out whether a permissible or impermissible reason underlies a peremptory challenge is the function of the trial judge.") (internal quotations omitted).

41. *Riley v. State*, Del.Supr., 585 A.2d 719, 727 (1990) (quoting *Crisp v. Duckworth*, 7th Cir., 743 F.2d 580, 583 (1984)).

42. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).

43. *Id.* at 689, 104 S.Ct. at 2065; *see also Shockley v. State*, Del.Supr., 565 A.2d 1373, 1376 (1989).

To evaluate counsel's pretrial preparation, the Superior Court granted Gattis' request for funds to recreate the crime scene and have the viability of his accident defense evaluated by Mr. Stuart H. James, a nationally known forensic consultant. Additionally, the Superior Court requested and received sworn affidavits from counsel for Gattis attesting to the investigative measures they undertook.[11]

Mr. James reported that he could not affirmatively say, with any scientific certainty, that the evidence as recreated weighed in favor of an accidental rather than an intentional shooting or that the shot was fired while Gattis was pushing on the door with his right hand around the door rather than while encountering the victim face to face.[45] Thus, the Superior Court concluded that even if Mr. James had testified at trial, his testimony would have added no weight to Gattis' accident theory and would not have changed the outcome of his trial.

According to the affidavits supplied by Gattis' trial counsel, Gattis at first claimed that he believed an unknown third person shot Ms. Slay. Because of his initial assertion, counsel did not develop an accident theory of the case. It was not until the trial was well under way that Gattis gave counsel any indication that his gun may have discharged accidentally. The affidavits further reflect that counsel took the following actions before and during trial: (a) they met with Gattis to discuss trial strategy, including the feasibility of constructing and presenting an accident defense once sufficient facts became known; (b) they interviewed neighbors and visited the crime scene, obtaining measurements of the layout of the apartment in the area of the apartment door; (c) they considered the need for a forensic expert to reconstruct what may have occurred immediately before the shooting but ultimately rejected the idea; and (d) they reviewed the physical evidence at police headquarters.

Gattis further argues that the State presented and the Superior Court adopted a factual version of the shooting that was physically impossible and absolutely insupportable, i.e., that Gattis kicked in the door, confronted Ms. Slay face to face and then shot her, execution style, directly between the eyes. This Court remanded the case to the Superior Court for further investigation into whether the State's theory of the case was impossible.

At trial, the State's theory of the case was that Gattis returned to Ms. Slay's apartment, kicked in the door, pointed his gun in her face and fired. Gattis, on the other hand, admitted to kicking in her door but contended that the gun discharged accidentally while he was standing behind the door and that he never saw Ms. Slay.[46] Dr. Inguito, the medical examiner, testified at trial that Gattis' position at the time of the shooting could not be determined, but that the bullet wound on the bridge of Ms. Slay's nose was consistent with either the victim and the assailant facing each other or with the assailant reaching around a partially open door and firing.[47]

Upon remand, the Superior Court conducted a hearing on this issue. At the hearing, Mr. James, the forensic consultant, stated that, in his opinion, Ms. Slay's apartment door was open no wider than twelve inches, that Ms. Slay was standing behind the door when she was shot and that she fell where she stood. He testified that, based upon the foregoing, it was not plausible that the door was open fully when the shot was fired, which, Gattis argues, was part of the State's theory of how the shooting took place.[48] Although the State argued that the shooting was intentional and occurred while Gattis and Ms. Slay were face to face, the State never presented testimony from its witnesses nor offered any argument by prosecutors asserting that the door was fully open when the face-to-face confrontation took place.[49] The State's witnesses testified at the hearing after remand that, based on reenactments they

44. *Postconviction op., supra* note 3, at 37–38.

45. *Id.* at 37.

46. *Slip op. II, supra* note 6, at 12.

47. *Id.* at 12–13.

48. *Id.* at 9.

49. *Id.*

had performed to prepare for the hearing, the assailant could have partially entered Ms. Slay's apartment even if the door had opened only twelve inches.[50]

In addition, there was some dispute about the significance of the pattern of "high velocity back spatter," or the pattern of blood on the walls resulting from the bullet's impact with the victim. The investigators found back spatter on Ms. Slay's telephone receiver but not on the apartment door, the nearby closet wall or the floor near the doorway. Mr. James concluded that the pattern of blood suggested that Ms. Slay may not have been standing near the door when she was shot.

In sum, Mr. James could not determine, to any degree of scientific certainty, whether Gattis entered the apartment and shot Ms. Slay while standing face to face with her, or whether he reached his head and right arm through the door and fired or whether he entered the apartment at all.[51]

Based on this testimony, the Superior Court determined that "even if [Mr.] James had testified at trial, his opinion about the door would have had little effect on the plausibility of Gattis' accident defense."[52] The Superior Court further found that Mr. James' testimony about the back spatter would have allowed the State to argue that such testimony was inconsistent with Gattis' own testimony that Ms. Slay was very close to the door when she was shot.[53] "Thus," the Superior Court concluded,

"the crux of [Mr.] James' testimony was that Gattis' version was more plausible than the State's, but that [Mr. James] could not say that the State's version was impossible. Viewing these opinions in light of the other testimonial and physical evidence, the Court concludes that [Mr.] James' testimony would not have altered the result at trial."[54]

Reviewing the totality of the evidence offered by the State and the defense, we are satisfied that the Superior Court did not abuse its discretion when it denied Gattis' motions for postconviction relief based on ineffective assistance of counsel. Gattis has not shown what evidence or course of action his attorneys should have presented or undertaken that would have resulted in a different outcome at trial. Nor has he shown that Mr. James would demonstrate that the State's theory of an intentional, face-to-face, execution style slaying was impossible. At trial, Gattis presented his accident defense. The jury did not accept his theory. On appeal, Gattis provides no basis for this Court to find that any lack of preparation by trial counsel caused the jury to reach a verdict it would not otherwise have reached. Accordingly, we find that Gattis' argument that he received ineffective assistance of counsel fails.

### Constitutionality of the Death Penalty

First, Gattis argues that the Delaware death penalty statute is unconstitutional because it permits arbitrary imposition of the death penalty. Second, he contends that the statute is cruel in violation of the Delaware Constitution and cruel and unusual in violation of the United States Constitution. Third, he contends that the statute is preempted by federal law, which prohibits correctional officers from obtaining the controlled substances necessary for execution. Finally, Gattis argues that the retrospective application of Delaware's revised death penalty statute violates the U.S. constitutional prohibition against *ex post facto* laws. Gattis raised none of these issues at trial or on direct appeal and he does not cite counsel's ineffectiveness for the procedural defect. In the interest of justice, however, we review his claims.

Concerning Gattis' contention that the Delaware statute permits arbitrary imposition of the death penalty, this Court addressed the question in part in our opinion following Gattis' direct appeal. We reviewed the Su-

50. *Id.* at 13 n. 8 and accompanying text.

51. *Slip op. II, supra* note 6, at 14 n. 9 and accompanying text.

52. *Id.* at 10.

53. *Id.* at 11–12.

54. *Id.* at 15.

perior Court's evaluation of the evidence in aggravation and in mitigation and determined that the Superior Court complied fully with the statutory standards for the imposition of the death penalty. We stated that the record reflected that "the Superior Court's decision to impose the death sentence was 'the product of a deliberate, rational and logical deductive process.' ... [and] that the sentence of death was not imposed on Gattis by the Superior Court arbitrarily or capriciously." [55] Gattis presents no evidence compelling us to change our earlier conclusion.

■ But Gattis argues that Delaware's death penalty statute itself permits arbitrary imposition of the death penalty because it fails to specify the weight that the sentencing judge must give to the jury's recommendation. The United States Supreme Court summarily dismissed this argument in *Harris v. Alabama*: "the Eighth Amendment does not require the State to define the weight the sentencing judge must accord to an advisory jury verdict." [56] Thus, Gattis' argument is without merit.

Second, regarding Gattis' argument that the Delaware statute is cruel, unusual and therefore violative of the United States and Delaware Constitutions, this Court has already rejected an identical claim in *State v. Deputy*.[57] Thus, Gattis' second claim is without merit.

Third, Gattis' contention that Delaware's death penalty statute is preempted by the Federal Comprehensive Drug Abuse Prevention and Control Act and the Federal Food, Drug and Cosmetic Act is without merit.

Addressing an identical claim in *Dawson v. State*, we stated, "This claim is procedurally barred by virtue of Dawson's failure to raise the issue on direct appeal. Dawson can establish neither cause nor prejudice to rebut the procedural bar." [58] Here, as in *Dawson*, the "Superior Court correctly concluded that this claim is devoid of merit." [59]

■ Finally, Gattis asserts that application of the revised statute to his case violates the *Ex Post Facto* Clause of Article I, Section 10 of the United States Constitution. In *State v. Cohen*, this Court addressed this issue as a certified question. Gattis participated in this certification process. In *Cohen*, this Court found that "application of the new law to all of the defendants in this proceeding is constitutionally permissible." [60] We determined that the changes to the Delaware statute were procedural rather than substantive. Thus, their retrospective application did not violate the *Ex Post Facto* Clause.[61] Therefore, Gattis, as a participant in the certification process in *Cohen*, cannot prevail on this argument in this appeal.

### Evidentiary Hearing and Expansion of the Record

■ Gattis argues that the Superior Court denied him due process when it denied his motions for an evidentiary hearing and an expansion of the record. Gattis acknowledges that the Superior Court did conduct a limited hearing on the sole issue of whether his attorneys' failure to listen to a taped interview between Gattis and Elizabeth Dew-

55. *Gattis v. State*, Del.Supr., 637 A.2d 808, 822 (1994) (quoting *Red Dog v. State*, Del.Supr., 616 A.2d 298,.310 (1992)).

56. *Harris v. Alabama*, 513 U.S. 504, 515, 115 S.Ct. 1031, 1037, 130 L.Ed.2d 1004 (1995) ("The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight."); *accord Dawson v. State*, Del.Supr., 673 A.2d 1186, 1196 (1996) (citing *Harris* ).

57. *State v. Deputy*, Del.Super., 644 A.2d 411, 420–22 (1994) (holding that execution by lethal injection neither violates the United States and Delaware Constitutions, nor offends evolving

standards of decency), *aff'd*, Del.Supr., No. 225, 1994, Holland, J., 1994 WL 285767 (June 21, 1994) (ORDER); *Dawson*, 673 A.2d at 1196–97.

58. *Dawson*, 673 A.2d at 1197 (citations omitted).

59. *Id.*

60. *State v. Cohen*, Del.Supr., 604 A.2d 846, 852 (1992).

61. *Id.* at 852–54 (citing *Dobbert v. Florida*, 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977) ("[e]ven though it may work to the disadvantage of a defendant, a procedural change [in the law] is not *ex post facto*")); *accord Bailey v. State*, Del.Supr., 588 A.2d 1121, 1125 (1991).

son, a psycho-forensic evaluator, rose to the level of ineffective assistance of counsel. But Gattis argues that the Superior Court violated its own Rule 61(c)(1)[62] when it did not return his motion to him with a statement of the reason for its return so that Gattis could have an opportunity to supplement the record and provide legal argument concerning the bases for his motions.

As the State contends, under Superior Court Criminal Rule 61, the Superior Court, in its discretion, is to determine whether summary disposition is appropriate.[63] Moreover, Rule 61(c)(1) plainly states that the motion is to be returned to the movant with a statement of the reason for its return, only if the judge so directs. Here, the Superior Court, in its discretion, did not deem it necessary to return the motion to Gattis. This was not an abuse of the Superior Court's discretion in light of the fact that the Superior Court did conduct a limited hearing on that evidence it deemed sufficiently significant to warrant hearing.

### Conclusion

This Court has considered all claims of error asserted by Gattis and finds none warranting disturbance of the findings made by the trial court. Accordingly, the decision of the Superior Court to deny Gattis' motions for postconviction relief is affirmed.

---

**62.** Super.Ct.Crim.R. 61(c)(1) provides:

If a motion does not substantially comply with the requirements of subdivision (b) of this rule [which describes the form and content requirements for a postconviction motion for relief], the prothonotary shall return it to the movant, if a judge of the court so directs, together with a statement of the reason for its return, and shall retain a copy of the motion and of the statement of the reason for its return.

**63.** *See Dawson v. State,* Del.Supr., 673 A.2d 1186, 1190 (1996); *Younger v. State,* Del.Supr., 580 A.2d 552, 556 (1990).