IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SHAHEED MATTHEWS, | § | |
| | § | C.A. No. 24, 2023 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID. No. 1806004163(N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: March 13, 2024
Decided: June 10, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware. **REVERSED AND REMANDED**.

Shaheed Matthews, *pro se*, New Castle, Delaware.

John R. Williams, Esquire (*argued*), Delaware Department of Justice, Dover, Delaware, *for Appellee State of Delaware*.

Garrett B. Moritz, Esquire (*argued*) and Elizabeth M. Taylor, Esquire, Ross Aronstam & Moritz LLP, Wilmington, Delaware, *Amicus Curiae for Appellant*.[1]

---

[1] The Court expresses its appreciation to the law firm Ross Aronstam & Moritz, and in particular attorneys Garrett Moritz and Elizabeth Taylor, for serving by Court appointment as *amicus curiae* and their commitment of time and effort in pursuing postconviction relief on behalf of Mr. Matthews.

**GRIFFITHS**, Justice:

On December 28, 2017, just after midnight in New Castle, Delaware, police found Antoine Terry lying on the sidewalk unresponsive due to multiple gunshot wounds. He died from his injuries. The police later arrested Terry's friend, Shaheed Matthews, for the murder.

In 2019, Matthews was tried for murder and possession of a firearm during the commission of a felony. No direct physical evidence linked Matthews to Terry's shooting. Instead, the State relied on circumstantial evidence—including evidence from Matthews's cellphone, witness testimony, video camera footage of varying quality, and gunshot residue of an unknown vintage found on Matthews's jacket. On direct appeal, this Court affirmed Matthews's convictions.

Matthews then filed a *pro se* motion for postconviction relief in the Superior Court. He claimed that his trial counsel was ineffective on four grounds. The Superior Court denied Matthews's motion and this appeal followed. On appeal, Matthews limits the scope of his claim for relief to one ground: that trial counsel's failure to move to suppress the evidence obtained from his cellphone constituted ineffective assistance of counsel.

With the State's entire case dependent on circumstantial evidence, it was essential for trial counsel to suppress any inappropriately derived evidence. Our review leads us to conclude that there is a reasonable probability that the outcome

2

of the trial would have been different if Matthews's trial counsel had moved to suppress the evidence obtained from his cellphone. Therefore, we reverse his convictions and remand to the Superior Court for a new trial without the taint of the improperly seized evidence.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. The Shooting of Antoine Terry

Antoine Terry and Shaheed Matthews were friends.[3] Matthews frequently stayed with his girlfriend, Devon Johnson. Johnson's residence was located at 227 Parma Avenue in New Castle, Delaware.[4] The residence was in a "high crime area" with "a lot of shootings."[5] On December 27, 2017, Terry, Matthews, and Johnson spent the evening together at Johnson's house watching a basketball game and eating Chinese food.[6] Johnson testified that around 10:30 p.m., she went upstairs to use the restroom and grab additional layers of clothing because she planned to drive Matthews to the home of his longtime friend, Chanelle Brooks.[7] She told the jury

---

[2] The facts, except as otherwise noted, are taken from the transcript of the trial testimony. *See* App. to Amicus Curiae's Opening Br. at AA1–239 [hereinafter "AA[_]"] (Trial Transcript [hereinafter "Trial Tr. at [_]"]).

[3] AA81 (Devon Johnson Testimony [hereinafter "Johnson Test. at [_]"] at 100:1–8).

[4] AA80 (Johnson Test. at 98:3–4).

[5] AA72, AA195 (Detective Eugene Reid Testimony [hereinafter "Reid Test. at [_]"] at 65:3–6; 124:4–12); *see also* AA99 (Johnson Test. at 174:8–11).

[6] AA82–84, AA99 (Johnson Test. at 105:3–114:3; 171:9–172:16); *see also* AA341 (Transcription of Detective Smith's Dec. 28, 2017 Body Camera Footage of Interview of Shaheed Matthews [hereinafter "Matthews Int."]).

[7] AA84–85 (Johnson Test. at 114:7–115:10).

3

that when she came back downstairs, Matthews and Terry were gone.[8] She testified that she waited in the house for Matthews to call her to pick him up and that she left to pick him up at a nearby church around 10:45 p.m.[9] She then drove him to Brooks's house.[10]

At 10:42 p.m., the New Castle County Police Department received a call from a resident on Briarcliff Drive, which runs parallel to Parma Avenue.[11] The resident reported hearing five or six gunshots.[12] Around the same time, another resident from 243 Parma Avenue called the police and reported being awakened by "three or four" gunshots.[13] Multiple officers responded to the area.[14] The police did not immediately locate a shooting victim.[15] Shortly after midnight, however, police found Terry's body on the sidewalk between 243 and 245 Parma Avenue.[16] He

---

[8] AA85, AA86, AA89, AA99, AA103 (Johnson Test. at 116:13–15; 120:5–9; 131:18–132:1; 173:1–3, 188:14–18).

[9] AA85, AA86, AA87, AA101 (Johnson Test. at 116:6–117:1; 121:18–122:10; 124:6–12; 180:11–23).

[10] AA84–85, AA101 (Johnson Test. at 114:16–115:10; 182:6–8); *see also* AA115–116 (Chanelle Brooks Testimony [hereinafter "Brooks Test. at [_]"] at 14:16–16:5).

[11] AA51, AA71 (Reid Test. at 196:23–197:12; 60:23–61:10).

[12] AA51, AA71 (Reid Test. at 197:16–198:10; 61:11–20).

[13] AA36, AA38 (Antoine Harrison Testimony [hereinafter "Harrison Test. at [_]"] at 136:14–137:16; 144:9–16).

[14] AA71 (Reid Test. at 62:3–5).

[15] AA51, AA72 (Reid Test. at 198:2–13; 63:1–15).

[16] AA10–11 (Master Corporal Casey Bouldin Testimony [hereinafter "Bouldin Test. at [_]"] at 34:15–36:15); *see also* AA12 (Detective Ronald Phillips Testimony [hereinafter "Phillips Test. at [_]"] at 42:20–22).

was "cold and stiff" with multiple gunshot wounds.[17]  They observed that he had "a hoodie around his head" and "a couple marks in the back of his jacket."[18]

## B. The Police Interview Matthews and Search His Cellphone

On December 28, 2017, two detectives from the New Castle County Police Department interviewed Matthews about Terry's death.[19]  During the interview, the detectives asked Matthews about his cellphone.  At first, he told them that he did not have a cellphone.[20]  Matthews ultimately relented and provided them with a cellphone number.[21]  When asked why he initially refused, he told them that he "didn't want to give the number out."[22]  The detectives then had the following exchange with Matthews:

> [Unknown Detective]: Well, listen, here's one thing I want to go over with you, okay?  So everybody that we've talked to, okay, uh, I know you're kind of like funny about your cellphone, and you don't want to give me the cellphone number.
>
> [Matthews]: You can, you can have it [unintelligible][.]

---

[17] AA11 (Bouldin Test. at 35:20).

[18] *Id.* (Bouldin Test. at 36:1–3); *see also* AA14 (Phillips Test. at 47:2–5).  Detective Reid described a photograph of Terry from the scene:  "[i]t appears as though he has a – starting from the top, he has a white hood over his head, a black jacket, like a black puffy jacket."  AA72 (Reid Test. at 66:11–13).

[19] *See* AA338–52 (Matthews Int.).  The interview transcript identifies one of the detectives as "Detective Smith" and the other as "unknown detective."  *See, e.g.*, AA338 (Matthews Int.).  The interview was captured on Detective Smith's body camera.  *Id.*

[20] AA338 (Matthews Int.).

[21] AA345 (Matthews Int.).

[22] *Id.*

[Unknown Detective]: Well, here's the thing; we have a search warrant for it.

[Matthews]: Okay.

[Unknown Detective]: Okay? So, uh, we're going to take it anyway.

[Matthews]: Yeah, you can [unintelligible][.]

[Unknown Detective]: Um, and I don't want you to think there's any ill will behind it.

[Matthews]: Mm-hmm.

[Unknown Detective]: But what happens is if, if we know somebody had contact with him, we take their cellphone. And it's not saying that we think you did anything wrong.

[Matthews]: Uh, I don't have it on me, but you can, you can definitely have the number.

[Unknown Detective]: Okay. Where is, where is the physical cellphone at?

[Matthews]: In town, uh, at my brother's house.

[Unknown Detective]: Okay. Um, we're going to need to get [ahold] of that.

[Matthews]: I got to buy a whole new phone?

[Unknown Detective]: No, no, no, so here's what happens, um, we get the phone. We do what's called a forensic examination.

[Matthews]: Yeah, that's –

[Unknown Detective]: Basically hook it up to a computer.

[Matthews]: Oh, okay, alright.

[Unknown Detective]: Um, they dump the contents of it, and then we give it right back to you.[23]

At trial, Detective Eugene Reid, one of the lead detectives on the case, confirmed that the police seized Matthews's cellphone: "we had a search warrant to collect his [cellphone], and we collected that from him at his residence."[24] In fact, the police did not secure a search warrant until the following day.[25]

On June 18, 2018, a grand jury indicted Matthews for first-degree murder, possession of a firearm during the commission of a felony, possession or control of a firearm by a person prohibited, and purchase of ammunition by a person prohibited (which was dropped by the State).[26] The possession or control of a firearm by a person prohibited charge was severed and proceeded to a bench trial.[27]

### C. The Trial of Shaheed Matthews

Matthews was tried for first-degree murder and for possession of a firearm during the commission of a felony in April 2019. At the outset, the State

---

[23] AA349 (Matthews Int.).

[24] AA64 (Reid Test. at 32:21–23).

[25] The detectives interviewed Matthews on December 28, but the warrant was not applied for nor issued until the following day. *See* App. to Opening Br., Ex. I.

[26] *Matthews v. State*, 241 A.3d 220, 2020 WL 6557577, at *2 (Del. 2020) (TABLE) [hereinafter "*Direct Appeal Order*"].

[27] *Id.*

7

acknowledged that its case was "entirely circumstantial."[28]  On numerous occasions throughout the trial, the State both referred to and asked witnesses about the evidence derived from Matthews's cellphone.

### 1. The State's Opening Statement

The State repeatedly referred to evidence obtained from Matthews's cellphone in its opening statement.  For example:

- "[Y]ou will hear evidence taking the form of video surveillance, [*cellphone*] *evidence*, and witnesses."[29]

- "[Y]ou will also hear *evidence pertaining to the defendant's* [*cellphone*] . . . . And you will hear the *contents of the defendant's phone* as it pertains to the evening of December 27th, 2017, into the following morning on the 28th."[30]

- "[G]oing with *the defendant's phone*, ladies and gentlemen, you will hear evidence beginning with 7:36 p.m. on the evening that Antoine Terry was murdered, and you will hear evidence that the defendant texted Antoine Terry."[31]

- "And you will hear additional [*cellphone*] *evidence* taken from the defendant's [cellphone] where we expect you will hear that the defendant called his girlfriend, Devon Johnson, at 10:45 p.m.  They have a 29-second conversation."[32]

---

[28] AA174 (Trial Tr. at 41:19–23) ("Our case is entirely circumstantial with respect to video evidence, gunshot residue, and the inconsistencies in the statements from prior witnesses, along with the reenactment video[.]").

[29] AA5 (Trial Tr. at 14:6–8) (emphasis added).

[30] *Id.* (Trial Tr. at 14:10–18).

[31] AA5–6 (Trial Tr. at 14:20–15:1) (emphasis added).

[32] AA6 (Trial Tr. at 18:17–21) (emphasis added).

- "*Going back to the defendant's* [*cellphone*] *again, you will hear much evidence from that* where you will hear evidence that the defendant calls a gentleman named Kevin Scott."[33]

- "You will also see from the records that are discussed that the evidence will show *the defendant made zero calls or zero text messages to Antoine Terry* after they parted ways the evening of December 27."[34]

- "[I]t's the State's burden to prove to you beyond a reasonable doubt . . . that the defendant was the one who murdered Antoine Terry . . . through *the totality of the evidence of the defendant's* [*cellphone*], the statements from the witnesses . . . ."[35]

### 2. The Cause of Terry's Death & Related Physical Evidence

The medical examiner assigned to the case testified that Terry's cause of death was multiple gunshot wounds.[36] She acknowledged that the State "[did not] know the time of [Terry's] death."[37]

The police never found the murder weapon.[38] Although the Delaware State Police's firearm identification expert was able to identify the caliber class of the bullet fragments found at the scene—.38 caliber—he acknowledged that a ".38

---

[33] AA7 (Trial Tr. at 20:9–12) (emphasis added).

[34] *Id.* (Trial Tr. at 20:20–21:1).

[35] AA9 (Trial Tr. at 27:5–14) (emphasis added).

[36] AA140 (Dr. Jennie Vershvovsky Testimony [hereinafter "Vershvovsky Test. at [_]"] at 113:14–114:2).

[37] *Id.* (Vershvovsky Test. at 114:21).

[38] AA156 (Reid Test. at 176:8–14).

caliber class includes several cartridge designations" that are all "very close in diameter" and can include "all of your 9 millimeters, .380's, your .38's, and .357 magnum[,]" all of which are "very close in diameter."[39] He noted that there are many types of firearms that could fire a .38 caliber bullet and he therefore could not identify the specific type of firearm that was used.[40]

### 3. Surveillance Video Evidence

The State presented video surveillance evidence taken from the following locations:

- A residence at 241 Parma Avenue.[41]

- A residence at 19 Briarcliff Drive (which runs parallel to Parma Avenue).[42]

- A playground near the Arbor Place Apartments (located in part on Parma Avenue).[43]

- A laundromat at 256 Parma Avenue.[44]

---

[39] *See* AA146 (James Storey Testimony [hereinafter "Storey Test. at [_]"] at 136:9–18).

[40] *Id.* (Storey Test. at 136:19–138:9). He also acknowledged that it was possible that more than one firearm could have been used. *See id.* (Storey Test. at 138:4–9) ("Q. Yes. So whatever generated the whole Projectile 3, it could have been the same gun that fired 1 and 2, or it could have been a different gun, correct? A. I couldn't tell you whether it was the same or whether it was not.").

[41] *See* AA45–46, AA49 (Detective Brandon Morris Testimony [hereinafter "Morris Test. at [_]"] at 171:1–178:11; 188:14–16).

[42] *See* AA46–47 (Morris Test. at 178:12–182:2; AA34–35 (Rasheeda Lee Testimony [hereinafter "Lee Test. at [_]"] at 129:12–131:2).

[43] *See* AA40–41 (Detective Alexandra Knorr Testimony [hereinafter "Knorr Test. at [_]"] at 154:7–155:4, 156:19–157:14).

[44] *See* AA52–53 (Reid Test. at 202:17–203:7)

10

- A 24-hour continuously operating pole camera that was physically located on Parma Avenue but looked out on the nearby intersection of Bizarre Avenue and Briarcliff Drive.[45]

The video surveillance evidence—devoid of sound and mostly in black and white—is of varying, and often poor, quality. In the portions of the videos in which people are visible, the low quality of the images and the distance from which the video was recorded preclude any conclusive identification of the individuals.

The State played eight video clips from a home surveillance system at 19 Briarcliff Drive taken on the night of the shooting:

- Two videos, approximately thirty seconds long (one is zoomed in), from 8:34 p.m. showing two distant figures exiting 227 Parma Avenue.[46]

- Two videos, approximately forty-five seconds long (identical except for the fact that the latter is zoomed-in), from 9:47 p.m. showing three distant figures entering 227 Parma Avenue.[47]

- Three videos, approximately three minutes long, from 10:38 p.m. showing a light go off and two grainy figures appearing to walk out of 227 Parma Avenue (identical except for the fact that the second video displays a yellow

---

[45] *See* AA42 (Detective Michael Santos Testimony [hereinafter "Santos Test. at [_]"] at 159:12–160:23). Santos, a detective on the case who specializes in electronic surveillance, described the "covert camera system located on Parma Avenue": "[t]hat system is a video only retention system where a covert camera is deployed to provide coverage of Parma Avenue at different locations. And that video is saved on a network video recorder at headquarters[.]" *Id.* (Santos Test. at 159:12–13, 17–22).

[46] *See* AA59 (Reid Test. at 11:13–13:12).

[47] *See id.* (Reid Test. at 13:13–14:14).

11

circle highlighting the entrance to 227 Parma, and the third is a zoomed-in version).[48]

- One video, twenty-seven seconds long, from 10:46 p.m. showing one grainy figure walking out of the home.[49]

When asked about whether he saw some type of altercation or argument in the above videos, Detective Reid said that "[a]ll [he] could testify to is that they're just seen walking."[50]

The State also played three better quality clips of the surveillance video taken from 241 Parma Avenue. Two videos, about eight seconds long, show two individuals running down Parma Avenue at 10:46 p.m.[51] One individual appears to have at least one arm outstretched and seems to be running behind another individual wearing a dark jacket and a hood on their head. The third video shows a car driving down Parma Avenue at 10:47 p.m.[52] Detective Reid acknowledged that he could not clearly discern the vehicle's make and model, nor could he see the vehicle's license plate number or its occupants.[53]

The State also showed the jury footage provided by management from the nearby Arbor Place Apartments. One twenty-second-long video shows a playground

---

[48] *See* AA60–61 (Reid Test. at 14:15–17:20, 18:9–19:12).

[49] *See* AA62 (Reid Test. at 24:13–25:11).

[50] *See* AA69 (Reid Test. at 53:19–54:2).

[51] *See* AA61–62 (Reid Test. at 19:20–24:12).

[52] *See* AA62 (Reid Test. at 25:15–26:8).

[53] *See* AA70 (Reid Test. at 56:8–58:17).

and a car driving down Parma Avenue at 10:47 p.m.[54]  Another thirty-four second video shows the front of a laundromat at 256 Parma Avenue and a car driving down the street.[55]

The last set of video surveillance clips shown by the State was from a New Castle County Police Department pole camera that looked out on the nearby intersection of Bizarre Avenue and Briarcliff Drive.  The first twenty-one second video from 10:48 p.m. shows a vehicle driving on Parma Avenue and taking a left turn at the end of the street.[56]  The second clip, which is fifteen seconds long and shot at 11:31 p.m., shows a car turning left onto Parma Avenue.[57]  The final sixteen-second clip from 11:57 p.m. shows a car turning right onto Parma Avenue and driving down the street.[58]

### 4. Non-Law Enforcement Witness Testimony

The State also presented testimony from several civilian witnesses, including Matthews's girlfriend, Devon Johnson; Terry's then-girlfriend, Tia Mosley; Matthews's close friend, Chanelle Brooks; Matthews's friend, Kevin Scott, who lived at 231 Parma Avenue; and Antoine Harrison, a nearby resident who looked through his blinds after he heard gunshots.

---

[54] *See* AA62–63 (Reid Test. at 26:9–27:3).
[55] *See* AA63 (Reid Test. at 27:4–16).
[56] *Id.* (Reid Test. at 27:17–28:19).
[57] *Id.* (Reid Test. at 30:3–13).
[58] *See* AA63–64 (Reid Test. at 30:14–31:1).

Johnson testified about the state of Matthews's and Terry's friendship on the night of Terry's shooting. She noted that the two men had been "friends for about six years" and that on the evening of December 27, "everybody[] [was] having a good time" and that no one was "fighting, or yelling, or doing anything . . . to antagonize anyone else during the game."[59] And, as further described below, the State questioned Johnson about several pieces of evidence derived from Matthews's cellphone, including questions about his call logs—including calls between the two of them and as calls between Matthews and others—and some of their text message exchanges.[60]

Mosley, for her part, had little recollection of the night of the shooting.[61] She could not recall the events of December 27 and 28, 2017, nor what she told Detective Reid when he interviewed her on December 28.[62]

Chanelle Brooks, a close friend of Matthews, also testified. She stated that her grandfather passed away on December 27 and that Matthews had visited her that day to offer his condolences.[63] She told the jury that, later that night, Matthews came to her house before midnight to drop off her car, which he frequently borrowed.[64]

---

[59] *See* AA99 (Johnson Test. at 171:17–172:23).

[60] *See infra* I(C)(6).

[61] *See* AA76 (Tia Mosley Testimony [hereinafter "Mosley Test. at [_]"] at 80:18–81:5).

[62] *See* AA76–77 (Mosley Test. at 81:6–84:20).

[63] AA114–115 (Chanelle Brooks Testimony [hereinafter "Brooks Test. at [_]"] at 10:7–11:7).

[64] AA115–116, AA121 (Brooks Test. at 14:15–15:7, 36:4–7).

She said that Matthews came inside to give her back her keys.[65] Mosley assumed that Johnson dropped Matthews off because "[Johnson] rarely [came] in the house, but [Matthews] never has anyone else drop him off or pick him up to my house besides [her]."[66]

Harrison, a nearby resident, testified that when he looked through his blinds around 10:30 p.m. after hearing gunshots, he "[saw] a dark figure" who "had a hoodie on. . . . And [] was big."[67] He thought that the figure was wearing an outfit that was either "real dark gray or black" and that his hood "was over his head."[68] Harrison told the jury that the figure appeared to have an extended arm, but he was not able to tell "whether . . . he was pointing," and he "didn't see a weapon" because "[i]t was too dark."[69] He also observed that "the pole light was not on, and that's one of the bad parts about that too."[70] "If it was on[,]" Harrison speculated, "[he] might have [something] [more] [he] could really say about the situation."[71] He "just did not see what the figure looked like" and could not see "the figure's face."[72]

---

[65] AA116 (Brooks Test. at 15:3–6).

[66] *Id.* (Brooks Test. at 15:7–12); *see also* AA121 (Brooks Test. at 38:1–4).

[67] *See* AA36–38 (Harrison Test. at 136:14–145:4).

[68] AA38 (Harrison Test. at 143:1–13).

[69] AA37 (Harrison Test. at 140:17–23, 141:3–4).

[70] *Id.* (Harrison Test. at 139:7–10).

[71] *Id.*

[72] AA37 (Harrison Test. at 141:7–8, 142:18–20).

### 5. Physical Evidence

The State also presented evidence of gunshot residue that was found on the right cuff of a dark blue winter jacket that the police recovered from Matthews when he was arrested.[73] He wore the jacket to the New Castle County Police Department headquarters the day he gave the detectives his phone.[74] A forensic scientist from a materials characterization lab testified that "there was a population of gunshot residue present" on Matthews's jacket.[75] She acknowledged that she could not tell how long the gunshot residue had been present on his coat, noting that she could not "say how [gunshot residue] got there, [or] when it got there. Just that it's there."[76] She conceded that "it was possible" that "it could have gotten there a month ago, a year ago" or even "multiple years ago" and that gunshot residue "can sometimes get trapped within the weave of the fabric" and can "actually stay . . . on fabric[] for a long period of time.[77] She also described how gunshot residue can get on fabric by means other than firing a weapon, namely through being in close proximity to someone firing a weapon or through transfer, such as someone grabbing the material

---

[73] *See* AA132, AA133 (Tarah Helsel Testimony [hereinafter "Helsel Test. at [_]"] at 81:3–82:1; 83:7–84:17); *see also* AA8 (Trial Tr. at 23:1–6).

[74] AA4 (Trial Tr. at 7:2–4).

[75] AA134 (Helsel Test. at 90:6–10).

[76] AA135 (Helsel Test. at 91:18–19).

[77] AA134–35 (Helsel Test. at 90:23–91:23).

or rubbing up against it.[78]  No gunshot residue was found on the left cuff or front right pocket of Matthews's jacket.[79]

### 6. Evidence from Matthews's Cellphone

The State presented and questioned witnesses extensively about the evidence that police derived from Matthews's cellphone, including call records and text messages.

The State questioned Johnson about the timing and content of text messages and calls between her and Matthews.[80]  For example, the State questioned her about a text message exchange she and Matthews had the morning after the shooting:

> Johnson: "I love you so much, and I cannot lose you."
>
> Matthews: "You won't babe.  Come to me as soon as you get off[.]"
>
> Johnson: "Changes have to be made now, okay[.]"
>
> Matthews: "I agree."[81]

The prosecution also asked Johnson about the phone calls she made to Matthews around 11:00 p.m. on the evening Terry was killed, as well as the two brief

---

[78] AA135 (Helsel Test. at 93:15–94:17).

[79] *See* AA133 (Helsel Test. at 83:7–84:17).

[80] *See* AA94–95 (Johnson Test. at 153:15–155:14, 157:12–158:9).

[81] *See id.*

conversations they had within the span of a few hours that night and a phone call they had around 7:00 a.m. the following morning.[82]

The State next presented Brooks with Matthews's call records. The prosecution asked her about a phone conversation the pair had at 11:20 p.m. on the night of the shooting.[83] The State also asked her about what appeared to be a missed call she received from Matthews at 11:35 p.m. and a twenty-four second call she made to Matthews five minutes later.[84]

The State also questioned Kevin Scott, Johnson's neighbor at 231 Parma Avenue, about Matthews's call records, including calls between Scott and Matthews on the night of the shooting. Scott told the jury that, during a call at 11:09 p.m., Matthews asked if Scott was "okay" because he heard that shots were fired nearby.[85] The State also asked Scott about a missed call he received from Matthews at 11:18 p.m. and a brief conversation the two had at 11:20 p.m.[86]

Additionally, the State presented evidence of Matthews's text messages and internet search history related to a potential gun purchase. The trial judge admitted the evidence over trial counsel's objection under Delaware Rule of Evidence 404(b). Specifically, the State introduced text messages that Matthews exchanged with an

---

[82] *See* AA93–94 (Johnson Test. at 149:23–153:14).
[83] AA116 (Brooks Test. at 15:16–16:21).
[84] *See id.*
[85] AA123 (Kevin Scott Testimony [hereinafter "Scott Test. at [_]"] 46:10–22).
[86] AA123–126 (Scott Test. at 46:23–55:6).

18

unknown person on December 20, 2017, in which Matthews inquired about the cost of a "Taurus Millennium," and, after the individual replied "450[,]" Matthews responded with, "[t]hat's too much."[87] In addition, the State presented evidence of Matthews's search history on December 25 and 26, 2017, showing that he "searched through Google" the terms "Ruger 45" and "Ruger P97."[88] On cross-examination, Detective Reid acknowledged that Matthews's internet search was "just a general search" and that "[t]here's no indication a purchase was made, or any attempt to purchase."[89]

### 7. The State's Closing Argument

Evidence from Matthews's cellphone also featured prominently in the State's closing argument. For instance:

- "Now, *[I] mentioned the defendant's cellphone. [Matthews's] [c]ellphone is important*, it's one of those things that's consistent. You got three calls, incoming missed from Devon Johnson at 10:49. You got a call to Kevin Scott right afterwards at 11:09."[90]

- "You heard Detective Reid testify *he went through the defendant's cellphone*, there's no texts from anybody indicating that there had been shots fired from Parma and there were no other calls in between those missed calls from Devon Johnson and when the defendant called Kevin Scott to see if everything was [alright]."[91]

---

[87] AA184, AA185 (Reid Test. at 82:17–23; 83:5).

[88] AA184 (Reid Test. at 80:8–19).

[89] AA191 (Reid Test. at 109:13–17).

[90] AA220 (Trial Tr. at 34:15–21) (emphasis added).

[91] *Id.* (Trial Tr. at 35:8–14).

19

- "But then *we go through the defendant's cellphone some more*, 7:34 in the morning: I love you so much and I can't lose you.  Just seven minutes later. . . . [H]ow are those text messages in relation if she did not know already?"[92]

- "*There's more from the defendant's cellphone*. . . . December 25th and 26th, the defendant has three searches for a firearm on his cellphone.  You heard Detective Reid testify that these searches were subsequently deleted before he handed that cellphone over to [the] New Castle County Police."[93]

- "December 20th, *got text messages from an unidentified person on defendant's phone* saying: These folks just hit him.  They have a Taurus Millennium – the detective testified to is a gun.  He asks how much? It's 450.  *There's a picture of the gun*.  The defendant says that's too much."[94]

- "[A]t some point in time [Matthews] learns that his good buddy has been murdered blocks from his house – *we don't see a single text message*.  Not to Antoine Terry asking him if he's okay or to anyone else talking about how his good friend has now passed.  *We don't see a single phone call* to Antoine Terry after the shots fired. . . . [M]aybe he didn't call Antoine Terry because he knew he was dead because he's the one that killed him."[95]

In total, the State mentioned the cellphone evidence at least eighteen times in its closing argument.

---

[92] AA221 (Trial Tr. at 38:18–39:15) (emphasis added).

[93] *Id.* (Trial Tr. at 39:18–40:1).

[94] *Id.* (Trial Tr. at 40:8–13).

[95] AA229 (Trial Tr. at 71:7–72:5) (emphasis added).

20

### 8. The Verdict & Sentencing

The jury found Matthews guilty on both charges. On July 1, 2019, the Superior Court sentenced Matthews to life plus three years in prison.[96] Matthews's direct appeal of his convictions followed.

### D. Matthews's Direct Appeal

On direct appeal, Matthews "raise[d] one narrow ground[—]whether the Superior Court abused its discretion when it permitted the State to admit evidence at trial about Matthews's internet search history and text messages related to the possible purchase of a gun."[97] Specifically, he "limited his challenge to relevance, and contend[ed] that the State did not show a nexus between the possible gun purchase and the actual gun used to kill Terry."[98] This Court affirmed his convictions.[99]

### E. Matthews's Motion for Postconviction Relief & Appeal

In October 2021, Matthews filed a *pro se* Rule 61 motion for postconviction relief.[100] He argued that trial counsel was ineffective on four grounds: (i) for failing to disclose the pole camera "and/or investigate camera footage for exculpatory

---

[96] AA334 (Sentencing Order).
[97] *Direct Appeal Order* at *1.
[98] *Id.* at *2.
[99] *Id.* at *3.
[100] *See* AA240–245 (Matthews's Motion for Postconviction Relief).

evidence[;]"[101] (ii) for "unlinking" Matthews's two criminal cases;[102] (iii) for failing to call Detective Smith (Detective Reid's partner) to testify;[103] and (iv) for failing to prepare for trial "and/or for failing to challenge the introduction of Mr. Matthews['s] [cellphone] evidence[.]"[104]

The Superior Court ordered Matthews's trial counsel to respond and counsel subsequently submitted an affidavit.[105] As to Matthews's claim of ineffective assistance of counsel on the ground that trial counsel should have moved to suppress the evidence derived from Matthew's cellphone, counsel averred that he "did not see a basis for objecting to the exclusion of all the [cellphone] information as a whole" and "recall[ed] objecting to a portion of the [cellphone] data in conference with the State and [the trial judge] . . . but [the] objection was overruled."[106]

On January 3, 2023, the Superior Court rejected all of Matthews's arguments for postconviction relief.[107] Relevant to this appeal, the Superior Court made several holdings regarding whether trial counsel was ineffective in failing to move to

---

[101] AA244.

[102] *Id.*

[103] *Id.*

[104] AA245. Matthews separately argued that his appellate counsel on direct appeal was ineffective on two grounds. *See id.* Neither of these arguments were raised on this appeal.

[105] *See* AA281–85 (Affidavit of Trial Counsel).

[106] AA283 (Affidavit of Trial Counsel).

[107] *See State v. Matthews*, 2023 WL 21545, at *1 (Del. Super. Jan. 3, 2023) [hereinafter "*Postconviction Decision*"].

22

suppress the evidence obtained from Matthews's cellphone.[108]  The court first acknowledged that the cellphone warrant was invalid given that it was an unconstitutional general warrant.[109]  Even so, the court found that it did not matter, holding that Matthews provided valid consent to the officers because he "offered to provide his phone to the police" and that he "made the offer *before* officers notified him that they had already obtained a warrant for his phone."[110]  The court further held that even if the consent was defective, the cellphone evidence "had no bearing on the outcome of the case" and thus was not prejudicial, because "[t]he video evidence, combined with [] Johnson's statements, leaves the [c]ourt with no room to reasonably conclude anyone other than [] Matthews could have been the shooter."[111]

On appeal, Matthews sole ground for claiming that his trial counsel was ineffective is that trial counsel failed to move to suppress the evidence obtained from his cellphone.  The Court appointed pro bono counsel as *amicus curiae* for purposes of this appeal in August 2023.

---

[108] *See id.* at *8.
[109] *Id.*
[110] *Id.* at *8–9 (emphasis in the original).
[111] *Id.* at *9.

## II.    STANDARD OF REVIEW

We review the Superior Court's denial of a motion for postconviction relief for abuse of discretion.[112]   We review ineffective assistance of counsel claims *de novo*.[113]

## III.    ANALYSIS

The Sixth Amendment to the Constitution of the United States guarantees the right to effective assistance of counsel in criminal prosecutions.[114]   Our Court has time and again reiterated that the right to counsel is the bedrock of our adversary system.[115]    Under *Strickland v. Washington*, a criminal defendant pursuing an ineffective assistance of counsel claim must show two things:  (1) that his counsel's performance was deficient; and (2) that the deficient performance prejudiced his defense.[116]

Defense counsel is deficient where counsel's representation falls below an objective standard of reasonableness.[117]   Judgments made by trial counsel that are "so far out of the realm of reasonable trial strategy" can qualify as ineffective

---

[112] *Starling v. State*, 130 A.3d 316, 325 (Del. 2015) (citing *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013)).

[113] *See Starling*, 130 A.3d at 325; *see also Purnell v. State*, 254 A.3d 1053, 1093–94 (Del. 2021) (citation omitted).

[114] *See* U.S. Const. amend. VI.

[115] *See, e.g.*, *Reed v. State*, 258 A.3d 807, 821 n.55 (Del. 2021) (citing *Purnell v. State*, 254 A.3d 1053, 1104 (Del. 2021) (citing cases)).

[116] 466 U.S. 668, 687 (1984).

[117] *See Starling*, 130 A.3d at 325 (citing *Gattis v. State*, 697 A.2d 1174, 1178 (Del. 1997)).

assistance.[118]  To prove that trial counsel was deficient, a criminal defendant must show that counsel made errors so serious that counsel was not functioning as guaranteed by the Sixth Amendment.[119]  A defendant bears a heavy burden to overcome the strong presumption that counsel's conduct fell within the wide range of reasonable conduct.[120]

To demonstrate that trial counsel's ineffectiveness resulted in prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[121]  A reasonable probability is a probability sufficient to undermine confidence in the outcome and is a lower standard than "more likely than not."[122]  For the reasons stated below, we find that Matthews has satisfied both prongs of this test.

### A. Trial counsel's failure to move to suppress the cellphone evidence constituted deficient performance under *Strickland's* first prong.

Trial counsel should have moved to suppress the cellphone evidence on two grounds:  (1) the warrant for Matthews's cellphone was an unconstitutional general warrant; and (2) Matthews did not provide valid consent to the police to search the contents of his cellphone.  Failure to do so was deficient under *Strickland*.

---

[118] *Id.* at 330.

[119] *See Panuski v. State*, 41 A.3d 416, 421–22 (Del. 2012).

[120] *Hoskins v. State*, 102 A.3d 724, 730 (Del. 2014).

[121] *See Starling*, 130 A.3d at 325 (quoting *Strickland*, 466 U.S. at 694).

[122] *See Ploof v. State*, 75 A.3d at 821 (quoting *Strickland*, 466 U.S. at 693–94).

25

**1. Trial counsel should have moved to suppress the cellphone evidence because the warrant for Matthews's cellphone was an unconstitutional general warrant.**

As a general matter, absent a recognized exception to the warrant requirement, warrantless searches and seizures are *per se* unreasonable.[123] Here, the Superior Court held that the warrant obtained by police to search Matthews's cellphone was an unconstitutional general warrant.[124] The State does not dispute this holding or argue otherwise.[125] And we agree—the warrant permitted police to conduct an "exploratory rummaging" through Matthews's phone.[126] And trial counsel should have been aware of the issues with the warrant, as *Wheeler* and *Buckham* had already

---

[123] *See Flonnory v. State*, 109 A.3d 1060, 1063 (Del. 2015) (citations omitted).

[124] *See Postconviction Decision* at *8 (citations omitted) ("[T]he [c]ourt finds the [cellphone] warrant to be a general warrant[—]that scrouge of executive overreach 'abhorred by the colonists' that permitted 'a general, exploratory rummaging in a person's belongings' for vaguely-defined categories of contraband."). This Court has recently addressed general warrants directed to the search of electronic devices at length. *See, e.g.*, *Terreros v. State*, 312 A.3d 651, 661–67 (Del. 2024); *Taylor v. State*, 260 A.3d 602, 613–19 (Del. 2021); *Buckham v. State*, 185 A.3d 1, 18–19 (Del. 2018); *Wheeler v. State*, 135 A.3d 282, 299–304 (Del. 2016).

[125] *See* Answering Br. at 8–10; AA306–312.

[126] *Wheeler v. State*, 135 A.3d at 298; *see also Andresen v. Maryland*, 427 U.S. 463, 480 (1976). For example, in the affidavit to the warrant, the officer attested that "through investigative interviews, it is alleged that Antoine Terry had shot Shaheed Matthews'[s] girlfriend in the leg approximately two years ago." App. to Opening Br., Ex. E. at ¶ 11. Yet the scope of the search is not limited to the date of that supposed shooting, rather it is undefined. And the scope of the search is broad and was targeted at "[t]he digital contents of any and all attached storage devices" to "include[,] but not limited to call logs, SMS (text messages), MMS (Media) messages, internet browsing history, images and or videos, any and all information that may identify subjects and or co-conspirators," and "any and all information[.]" App. to Opening Br., Ex. E.

26

been decided before the pendency of this case. Matthew's trial counsel plainly should have challenged the warrant's constitutionality.

Review of counsel's performance under *Strickland* is deferential and we respect the "wide latitude counsel must have in making tactical decisions."[127] But on this record, nothing suggests trial counsel's choice was tactical. In his affidavit, trial counsel averred that he "did not see a basis for objecting to the exclusion of all the [cellphone] information as a whole."[128] And during trial, counsel only made an evidentiary objection under D.R.E. 404(b) as to a subset of information derived from Matthews's phone. Here, the decision to object, "rather than being a tactical decision, is better described as damage control" after failing to move to suppress the warrant in the first instance.[129] Accordingly, trial counsel's failure to do so was deficient under *Strickland*.

### 2. Trial counsel should have moved to suppress the cellphone evidence because Matthews did not provide valid consent to search his phone.

Even if a search warrant is found to be an unconstitutional general warrant, a search will not run afoul of the Fourth Amendment if it is conducted with a person's

---

[127] *Strickland*, 466 U.S. at 689; *see id.* ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.").

[128] AA283 (Affidavit of Trial Counsel).

[129] *See Starling*, 130 A.3d at 328.

valid consent.[130]  Consent can be express or implied.[131]  Under *Bumper v. North Carolina*,[132] the State has the burden of proving that Matthews voluntarily consented to the search of his cellphone.[133]  Its burden "cannot be discharged by showing no more than acquiescence to a claim of lawful authority."[134]  The State did not meet its burden here.

In its decision below, the Superior Court concluded that Matthews provided valid consent because he "offered to provide his phone to police" and did so "before officers notified him they had already obtained a warrant for the phone."[135]  We disagree and believe the record supports a different conclusion.  The interview between Matthews and the detectives shows that Matthews did not provide the detectives with valid consent to search his phone:

> [Unknown Detective]: Well, listen, here's one thing I want to go over with you, okay?  So everybody that we've talked to, okay, uh, *I know you're kind of like funny about your cellphone, and you don't want to give me the cellphone number.*
>
> [Matthews]: You can, you can have it [unintelligible][.]

---

[130] *See Cabrera v. State*, 173 A.3d 1012, 1023 (Del. 2017).

[131] *Cooke v. State*, 977 A.2d 803, 855 (Del. 2009).

[132] 391 U.S. 543 (1968).

[133] *Bumper*, 391 U.S. at 548 (footnotes and citations omitted) ("When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.").

[134] *Id.* at 548–49.

[135] *Postconviction Decision* at *8–9.

[Unknown Detective]: Well, here's the thing; we have a search warrant for it.

[Matthews]: Okay.

[Unknown Detective]: Okay?  So, uh, we're going to take it anyway.

[Matthews]: Yeah, you can [unintelligible][.][136]

This exchange cannot be fairly read to show that Matthews unequivocally consented to a search of his cellphone.  It is ambiguous at best.  The above excerpt suggests that before the detectives told Matthews that they had a warrant, they were discussing his cellphone number rather than the cellphone itself.  At most, Matthews provided consent to search his cellphone *after* law enforcement told him they had a warrant.  This is insufficient.  Under *Bumper*, there can be no consent where the official conducting the search has first asserted that they have a warrant.[137]

The trial court and the State both assert that this case is factually analogous to the *Blackwood* case that this Court recently affirmed.[138]  There, the defendant's consent was not obtained upon the announcement that the police had a warrant.  Instead, the defendant's consent was given freely:  he volunteered the pattern passcode that was required to search his phone, when the detective had trouble

---

[136] AA349 (Matthews Int.) (emphasis added).  The State does not dispute the unintelligible portions of the interview transcript.

[137] *Bumper*, 391 U.S. at 548.

[138] *Postconviction Decision* at *9 (citing *State v. Blackwood*, 2020 WL 975465, at *6–7 (Del. Super. Feb. 27, 2020), *aff'd*, 306 A.3d 529 (Del. 2023)).

accessing his phone with the passcode, he entered the passcode for the detective and instructed him again on how to gain access to his phone, and he also freely provided his cellphone number.[139] He also encouraged the detective to access information in his cellphone to verify his alibi.[140] *Blackwood* is thus inapposite. Here, it is not clear that Matthews was referring to his cellphone when he said, "you can have it." Rather, given the unintelligible portions of the transcript, and the context of the conversation, the statement was ambiguous at best.

Ambiguity as to whether a party provided valid consent is resolved against a finding of consent.[141] Here, we find that Matthews did not provide valid consent to the detectives to search his cellphone. Thus, trial counsel's failure to move to suppress the evidence obtained from Matthews's cellphone was deficient under *Strickland*. We now must determine whether Matthews's claim passes muster on the prejudice prong of *Strickland*.

### B. Trial counsel's failure to move to suppress the cellphone evidence prejudiced Matthews.

We find that trial counsel's performance prejudiced Matthews. "When a defendant challenges a conviction, the question is whether there is a reasonable

---

[139] *See Blackwood v. State*, 306 A.3d 529, 2023 WL 6629581, at *6 (Del. 2023) (TABLE).
[140] *Id.*
[141] *See State v. Harris*, 642 A.2d 1242, 1247 (Del. Super. 1993) (finding "ambiguous and equivocal" purported "consent" insufficient); *United States v. Taverna*, 348 F.3d 873, 878 (10th Cir. 2003) (cleaned up) (government must "proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given").

probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."[142]  This is the case here.  We disagree with the Superior Court's holding that "even if the consent was defective, the [cellphone] evidence had no bearing on the outcome of the case."[143]  The trial record shows, and the State has repeatedly conceded, that it relied heavily on the cellphone evidence given that its theory of the case was premised entirely on circumstantial evidence.

The other circumstantial evidence that the State presented was not so overwhelming that we can be confident that Matthews would have been found guilty beyond a reasonable doubt without the cellphone evidence.  The trial court held that "[t]he video evidence, combined with [] Johnson's statements, leaves [it] with no room to reasonably conclude anyone other than Mr. Matthews could have been the shooter."[144]  We cannot agree.

The video surveillance evidence is not as strong as the trial court purports.  First, the video evidence from 19 Briarcliff does not—as the trial court suggests—show with any certainty that two people were getting into a fight.  The nighttime video quality is very poor and the individuals in the video are not identifiable.  They

---

[142] *Strickland*, 466 U.S. at 695.

[143] *Postconviction Decision* at *9.

[144] *Id.*

appear to be walking.[145]  In the clearest set of surveillance footage from 241 Parma, although it shows two individuals running down the street with one person appearing to chase the other with an outstretched arm, the individuals remain unidentifiable, and their faces are never shown.  The other videos show an unidentifiable vehicle. Thus, even given Johnson's statements as to when Matthews and Terry left the home, there is in fact room to conclude that the shooter could be someone other than Matthews.

The remaining circumstantial evidence fares little better.  No murder weapon was found, the gunshot residue found on Matthews's coat could not be linked to Terry's killing, no witnesses linked Matthews to the shooting, and the trial testimony of both Johnson and Brooks was inconsistent with the prior statements they gave to the police.  Without the cellphone evidence, the State's case is significantly weaker. And our objective assessment of the likely prejudicial effect of the evidence derived from Matthews's cellphone is consistent with the trial court's own statements that it made during trial.[146]

---

[145] Indeed, when asked about the footage, Detective Reid did not testify that it showed a physical altercation.  Rather, he told that jury that "all [he] could testify to was that it showed two individuals walking." AA69 (Reid. Test. at 54:1–2).  When asked about his opinion on what was happening in the video, he stated that "[w]hen [he is] viewing the video, it appears as though there are two figures standing there, granted, very small. . . . At some point in time those figures appear to be going back and forth, *which I took as* a physical altercation." AA202 (Reid Test. at 153:15–22) (emphasis added).

[146] *See, e.g.*, AA175–176 (trial judge acknowledging that certain cellphone evidence was both material and prejudicial).

Moreover, the trial record is replete with references to evidence obtained from the search of Matthews's cellphone and demonstrates that it was material and significant. From the start to the end of Matthews's trial, the State repeatedly admitted how important Matthews's cellphone evidence was to its case, including for purposes of proving plan, motive, and intent.[147] The arguments that the State made in support of the admission of Matthews's text messages about purchasing a gun and gun-related internet search history are particularly illustrative. For example, the State underscored how "probative" and "material" that evidence was to its case, while also acknowledging that it was "certainly" prejudicial.[148] Indeed, the prosecutor argued that the evidence was "need[ed]" because "[n]o gun was recovered[,]" "[t]here [we]re no eyewitnesses saying the defendant murdered Antoine Terry[,]" and the State's case was "entirely circumstantial."[149] The State cannot now change position and disclaim the importance of the evidence.[150]

---

[147] *See, e.g.*, AA220 (Trial Tr. at 34:15–17) (stating in closing argument how "important" evidence was from Matthews's cellphone due to its "consistenc[e]" given that the testimonial evidence was inconsistent).

[148] AA173, AA174 (Trial Tr. at 37:13; 41:1–2).

[149] AA174 (Trial Tr. at 41:17–20). The trial judge agreed: "I think *it is material*. Both the text message[s] and the [i]nternet search *are material* to the ultimate fact in dispute in this case as to whether or not the defendant intentionally killed the victim, Antoine Terry, with a gun." AA175 (Trial Tr. at 45:10–16) (emphasis added). And the judge concurred that such information was prejudicial: "I think it's got prejudice, and the State's acknowledged that." AA176 (Trial Tr. at 45:10–16).

[150] At oral argument, while conceding that its case was circumstantial, the State appeared to change tack, arguing that the cellphone evidence was merely "duplicative." *See* Delaware Supreme Court,

Without the evidence derived from Matthews's cellphone, there is a reasonable probability that the outcome of Matthews's trial would have been different. Accordingly, Matthews was prejudiced by trial counsel's deficient performance under *Strickland's* second prong.

## IV. CONCLUSION

For the foregoing reasons, the Superior Court erred in denying Shaheed Matthews's Rule 61 motion for postconviction relief. We therefore REVERSE and VACATE Matthews's convictions. We REMAND this case to the Superior Court for a new trial consistent with this opinion.

---

*Oral Argument Video*, Vimeo, at 32:12–33:38; 45:12–24; 46:14–19 (March 12, 2024) https://vimeo.com/922089824.